UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

NANCY MILLER-RICH,

*Plaintiff,*

- *against* -

ALTUM PHARMACEUTICALS INC.,
BETTERLIFE PHARMA INC.,
AHMAD DOROUDIAN,
STEPHEN DATTELS,
JOHN AND JANE DOES 1-50 and
ABC CORPORATIONS 1-20,

*Defendants.*

**COMPLAINT**

**PLAINIFF DEMANDS
TRIAL BY JURY.**

     Plaintiff Nancy Miller-Rich by her undersigned counsel, McCarney Law

P.C., for her complaint alleges:

     1.  Plaintiff brings this action for damages arising from defendants' violations

of the antifraud provisions of Section 10(b) of the Securities Exchange Act of 1934

("Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10.b-5,

aiding and abetting deceptive acts and false statements pursuant to Section 20(e) of the

Exchange Act, 15 U.S.C. § 78t(e), common law fraud and breaches of contract.  Plaintiff

seeks $2 million in compensatory and $10 million in punitive damages.

1

## PARTIES

2.  Plaintiff Nancy Miller-Rich resides at 565 Broome Street, Apt. 22A, New York, NY 10013.

3.  Upon information and belief, defendant Altum Pharmaceuticals Inc. ("Altum") is a corporation formed under the laws of Canada with an office at 1275 West 6th Avenue, Suite 300, Vancouver, BC V6H 1A6, Canada.

4.  Upon information and belief, defendant BetterLife Pharma Inc. ("BetterLife") is a corporation formed under the laws of Canada with an office at 1275 West 6th Avenue, Suite 300, Vancouver, BC V6H 1A6, Canada.

5.  Upon information and belief, defendant Ahmad Doroudian is an individual with an address at 4172 Doncaster Way, Vancouver, BC V6S 1V9, Canada.

6.  Upon information and belief, defendant Stephen Dattels is an individual with an address at Lot 5, Lagomar Road, Palm Beach, FL 33480.

7.  Upon information and belief, defendants John and Jane Does 1 through 50 are individuals, the present identities of whom are unknown to plaintiff, who are party to defendants' fraudulent conspiracy as alleged below.

8.  Upon information and belief, defendants ABC Corporations 1 through 20 are corporations, the present identities of which are unknown to plaintiff, which are party to defendants' fraudulent conspiracy as alleged below.

## JURISDICTION AND VENUE

9.   This Court has federal question subject matter jurisdiction under 28 U.S.C. § 1331 and Section 27 of the Exchange Act, 15 U.S.C. § 78jaa, over the claims arising under the antifraud provisions of Sections 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), Rule 10b-5 thereunder, 17 C.F.R. § 240.10.b-5, and Section 20(e) of the Exchange Act, 15 U.S.C. § 78t(e), and pendent jurisdiction over the common law fraud and breach of contract claims.

10.   This Court has diversity jurisdiction under 28 U.S.C. § 1331 over the claims asserted in this action because the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and plaintiff is a citizen of New Jersey and defendants are citizens of either Canada or Florida.

11.   Venue lies in respect of the federal securities law claims under Section 27 of the Exchange Act, 15 U.S.C. § 78jaa, because an act or transaction constituting the violation occurred in this District and defendants may be found or transact business here.

12.   Venue lies under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the state law claims occurred in this District.

13.   This Court has *in personam* jurisdiction over defendants pursuant to Fed. R. Civ. P. 4(k)(1)(A) because they would be subject to the jurisdiction of the courts of general jurisdiction of New York State where this Court is located.  Such jurisdiction lies under the long-arm provisions of CPLR § 302(a)(1)-(3).  Section (a)(1) jurisdiction obtains because plaintiff's claims arise from the defendants, either directly or through their co-conspirator defendants, having transacted business within the State of New York, contracted to supply

goods and services here in the form of financing, securities and pharmaceuticals, and entered into the Employment Agreement described below to be performed in New York, all as set forth below.  Section (a)(2) jurisdiction lies because defendants, either directly or through their co-conspirators, committed tortious acts within this State from which plaintiff's claims arise, including without limitation their fraudulent misrepresentations concerning Altum's stock price and proposed amalgamation, fraudulent diversion of the Covid-19 Opportunity, and fraudulent concealment of their scheme in this State, all as alleged herein.   Section (a)(3) jurisdiction exists because defendants, either directly or through their co-conspirator defendants (1) have committed tortious acts without the State as alleged below causing injury to plaintiff within the State, and (2)(i) regularly do or solicit business, or engage in a persistent course of conduct or derive substantial revenue from goods used or consumed or services rendered, in the State of New York, or (ii) expect or reasonably should expect their fraudulent acts to have consequences within New York State and derive substantial revenue from interstate or international commerce.

14. Defendants, each of them, individually, or through the acts of their co-conspirator defendants described below, have committed overt acts in further of their fraudulent scheme within the State of New York, and are otherwise subject to jurisdiction in this Court based upon the acts and omissions of their co-conspirators.

15. In the event any defendant were not subject to *in personam* jurisdiction in the courts of general jurisdiction of New York State in respect of any federal claim, then exercising such jurisdiction would be proper under Fed. R. Civ. P. 4(k)(2) consistent with the United States Constitution and laws.

4

## FACTS

16. Prior to the events at issue, plaintiff Nancy Miller-Rich held upper-level management positions for thirty-five years in the pharmaceutical, biotech, and healthcare industries.  She held senior management positions at Sandoz (now Novartis), Schering-Plough and Merck where she was a member of the Operating Committee responsible for launching several innovative products worldwide, including the breakthrough Gardasil vaccine for human papillomavirus ("HPV") and Keytruda immunotherapy for cancer. These medications reached millions of patients across the globe and created billions in shareholder value, with Keytruda alone generating some $18 billion annually.  Ms. Miller-Rich received numerous corporate awards and accolades for her achievements industry wide and presently serves on Boards of Directors of four publicly traded pharmaceutical companies and two private biotech companies.

17. Defendant Ahmad Doroudian had likewise been active in the pharmaceutical industry prior to meeting Ms. Miller-Rich having held senior positions at nearly a dozen firms during his career, mostly short-term stints at start-up concerns.  He left one of these positions, CEO of pharmaceutical manufacturer Pangeo (USA) Corp. ("Pangeo'), after his auditors resigned during a joint investigation by the Royal Canadian Mounted Police and US Drug Enforcement Administration into unlawful distribution of Pangeo's 60mg pseudoephedrine tablets used in illegal methamphetamine labs. Doroudian is a citizen of both Canada and Iran and is active in the Ismaili community near his home in Vancouver, Canada which serves as a source for investors, including investors in defendant BetterLife.

18.   Defendant Doroudian was Chairman and CEO of Altum in June 2018 when he sought Ms. Miller-Rich out at the Jeffries Healthcare Conference in New York City.  Altum was a start-up private biopharmaceutical company based in Vancouver engaged in clinical development of new products for treatment of HPV and cancer in which Ms. Miller-Rich had particular expertise.  Doroudian was looking to New York Venture Capital firms, bankers and pharmaceutical investors to underwrite its efforts to obtain FDA approval for use of interferon alpha 2b ("IFN a2b") for treatment of HPV and to market a gallium-based anti-cancer agent ("AP-002").  Ms. Miller-Rich's experience and profile in the industry would greatly enhance his ability to attract investors.

19.   At a meeting following the conference arranged at Doroudian's request, he aggressively recruited Ms. Miller-Rich to assist with Altum's efforts to gain funding for the development of its two pipeline products for the U.S. market.  He was especially keen to move forward with the development of IFN a2b as an HPV treatment.  Merck was the innovator of IFNa2b and had obtained U.S. approval to market the drug under the brand name Intron-A to treat Hepatitis B & C.  In order to obtain U.S. Food and Drug Administration ("FDA") approval for a new indication for IFNa2b, Altum would need to demonstrate biosimilarity to the reference compound, Intron-A.  Ms. Miller-Rich's close relationships with key personnel at Merk would be invaluable.

20. After some discussions, Ms. Miller-Rich agreed to assist on a part-time consultancy basis for a three-month period.  Doroudian was so pleased with her efforts during this period that he asked her to join the Board of Directors as Executive Chairman.

6

The arrangement was formalized in a written employment agreement effective as of September 17, 2018 (the "Employment Agreement")(**Ex. A**).

21. Under the Employment Agreement, Ms. Miller-Rich would provide strategic guidance to the Company for the development of its HPV and cancer drugs and assist CEO Doroudian in securing another $20 million round of investor funding.  (Empl. Agmt., Sched. A).   She would continue to be based in lower Manhattan where she resided and work on Altum matters approximately 20-hours per week.  (§ 2.2).  Although she would make herself available in Canada as needed, her services would be performed "generally . . . in the United States" and she would be paid in US currency.  (Sched. A & § 13.1).  Her initial compensation was set at $410,000, including a $50,000 signing bonus payable in immediately exercisable stock options, as well as $180,000 in salary, $80,000 in stock and $100,000 in options, each payable in equal quarterly installments.  (Sched. B).

22. Ms. Miller-Rich thereafter fully performed her obligations under the Employment Agreement.  Over seventy meetings were held, more than twenty of which occurred in New York, to progress US market interest and funding for both IFN a2b as an HPV treatment and AP-002 as an anti-cancer drug.  Her former colleagues at Merk provided Altum with access to $2.4 million in Intron-A at no cost which would enable Altum to demonstrate to the FDA that Altum's product was the biosimilar equivalent.

23. Ms. Miller-Rich also formulated an investor presentation and worked with the development team, many of them U.S. employees, consultants and companies.  She targeted nearly one hundred Venture Capital investors as potential sources of funding. After meeting Ms. Miller-Rich at a luncheon in Manhattan, partner Oscar Bekk of Ortac

AG, a Zurich-based investment firm representing wealthy European investors, gave the green light for an additional $ 2.6 million in funding for Altum.

24.   At Doroudian's direction, Ms. Miller-Rich primarily focused her efforts on the U.S. market.   Her strategic analysis, valuation and forecasting work were all tailored toward the needs of American venture capital firms and pharmaceutical companies.  She targeted the New York City and New Jersey market with which she was most familiar.  The approval process involved on-going discussions with the FDA.  Clinical work was to be performed in the United States as the leading medical experts in the field were located at American universities.

25. In recognition of her achievements and as required under the Employment Contract, Altum made the quarterly $45,000 salary payments to Ms. Miller-Rich for the last quarter of 2018 and all four quarters of 2019 as required, but thereafter failed and refused to make further salary payments without justification or explanation.

26. Altum further purported to comply with its obligations under the Employment Agreement to make quarterly distributions of $20,000 in Altum common stock and $25,000 in options for the last quarter of 2018 and all four quarters of 2019 as required, but thereafter failed and refused to make quarterly share distributions without justification or explanation.  The distributions were all calculated at a stock price of $1.20/share which Altum and Doroudian represented to be the fair market value of such shares.

27. Ms. Miller-Rich reasonably relied on the misrepresentations of Altum and Doroudian regarding the fair market value of the quarterly common stock and option

distributions (the "Altum Stock Misrepresentations") and continued to perform her obligations under the Employment Agreement fully and faithfully in reliance thereon.

28.  In fact, as revealed by internal Altum corporate records to which Ms. Miller-Rich would later gain access as described below, and as Altum and Doroudian both then and there well knew, the fair market value of Altum shares was only a fraction of the $1.20 price used to calculate the quarterly distributions to Ms. Miller-Rich.  The diminution in value resulted from Doroudian's systematic (1) payment of finder's fees to his friends for sourcing new investors with Altum shares at no cost, (2) issuance of Altum shares to himself for no consideration which he in turn would sell to Altum investors at a higher price to facilitate his diversion of these new investments to himself, and (3) issuance of shares to other investors at much lower prices, many for no consideration whatsoever.  Had a true and correct valuation been utilized, Ms. Miller-Rich would have received a far greater number of shares.

29.  On March 25, 2020, Altum Chief Medical Officer Angela Ogden reported to the Altum Board that Wuhan China was utilizing IFN a2b in an inhaler form for treatment of Covid-19.   At the time the three-person board consisted of Doroudian, Ms. Miller-Rich and Ali Ardakani.  Ardakani had been responsible for bringing the gallium-based anti-cancer opportunity and the pharmaceutical development team to Altum.  The board immediately recognized the opportunity to seek FDA approval of Altum's IFN a2b as a Covid-19 treatment on an emergency use authorization basis.  The potential for Altum to help patients, responsibly gain approval and realize significant profits in the short-term

from IFN a2b (the "Covid-19 Opportunity") was manifest.  The Altum shareholders stood to reap a windfall from the news and eventual sales.

30.  Doroudian, however, had other plans.  He was also a major investor in a publicly traded cannabis company which he had co-founded, defendant BetterLife.  The shares of BetterLife (formerly Pivot Pharmaceuticals Inc.)  were publicly traded on both the Canadian Stock Exchange ("CSE") and U.S. Over The Counter ("OTC") markets with a substantial number of U.S. investors.  More than 56 million shares—nearly one-third of those outstanding—were owned by U.S. investors as of July 2019.

31.  After a series of acquisitions, BetterLife was focusing on cannabis laced tablets, capsules, soft gels and beverages as well as edible mints and candies and intimate lubricants.  Doroudian had brought in many of his cronies from the Ismaili community in Canada as early investors who stood to reap substantial benefits together with Doroudian should its share price escalate dramatically.

32.  Doroudian had also secured a substantial participation in BetterLife from investment partnership High Park Ventures led by Canadian lawyer Stephen Dattels.  Doroudian was hopeful that Dattels, who had garnered his personal wealth from investments in the mining industry and had residences in London, Palm Beach and Bermuda, would bring in capital to fund BetterLife's cannabis expansion plans.  Dattels and the group of investors he led had recently assumed control of BetterLife pursuant to an undisclosed governance agreement in order to direct Doroudian.   As Dattels and his investors had cemented 40% control over BetterLife and held warrants to secure even greater control, they stood to reap the most benefit from a dramatic increase in BetterLife's

stock price, all but a certainty should BetterLife secure control of the Covid-19 Opportunity.

33. The defendants, each of them individually and together, thereafter combined, conspired confederated and agreed to divert the Covid-19 Opportunity from Altum to themselves. It was an object of the conspiracy, and means of its commission, that the Covid-19 Opportunity would be diverted from Altum's shareholders at less than fair value by whatever means possible. It was a further object of the conspiracy, and means of its commission, that the transfer of the Covid-19 Opportunity to BetterLife would increase its stock price for the benefit of defendants at the expense of Altum's other shareholders.

34. In furtherance of the conspiracy, defendant Dattels via email dated April 16, 2020 directed BetterLife's Chairman and fellow investor, Krisztian Toth of the Fasken law firm, to secure a license of the IFN a2b rights from Altum on below market terms. Toth thereafter had a letter of intent ("LOI") prepared binding Altum to an exclusive license to BetterLife with an essentially one-sided commitment. Contrary to the industry standard for such transactions which would require a substantial upfront cash component, the transaction involved payment in BetterLife stock and warrants which would be of little use in Altum's development efforts and detrimental to Altum's scientific credibility. BetterLife reserved to itself unilateral rights to cancel the transaction should it not be able to secure its own financing for IFN a2b development efforts as it did not itself have the necessary capital. This was an unprecedented condition for investments involving break-through pharmaceuticals.

35.  Recognizing that Doroudian himself was hopelessly conflicted in respect of the transaction given his dual shareholdings in both Altum and BetterLife, Toth's draft of the LOI provided for signature by Ms. Miller-Rich on behalf of Altum.  Knowing full well that Ms. Miller-Rich would never agree to such a deal, defendants, in furtherance of the conspiracy, asked the Altum general counsel to change the signatory to Doroudian himself. Doroudian executed the LOI on Altum's behalf on the afternoon of May 6, 2020.  Although his fellow board members had no inkling of the transaction, the LOI by its terms was fully binding even in the absence of the more formal license agreement that was contemplated therein.

36.  Later that evening at 7:30 pm board resolutions were circulated to Altum directors Miller-Rich and Ardakani for their review and approval.  This was the first they learned of defendants' scheme to divert the Covid-19 Opportunity.  As it was immediately apparent that Doroudian was breaching his fiduciary duties to the company by secretly arranging to license Altum's most valuable asset at a fraction of its value, the resolution was summarily rejected.

37. Notwithstanding the Altum board's rejection, BetterLife issued a press release the following day announcing that it had secured a license to Altum's IFN a2b rights which it planned to market as a potential Covid-19 treatment under the trade name "AntiCovir."

38.  After further investigation of Doroudian's self-dealing, Ms. Miller-Rich and Mr. Ardakani by majority vote of the board on May 21, 2020 suspended both Doroudian and Chief Financial Officer ("CFO") Moira Ong and terminated the General Counsel Stuart

Muglich.  The board subsequently retained Blakes firm as outside counsel to assist with their investigation.

39.  Review of Doroudian's email account and the financial records maintained by CFO Ong revealed widespread self-dealing and stock dilution by Doroudian.  Nearly 450,000 shares of Altum common stock had been distributed to various finders at no cost which served both to offset the amount of the investment and to dilute the stock price. Doroudian issued more than 1.1 million shares in Altum common stock and made cash payments of nearly $1.6 million to finders sourcing Altum investments.  During the same period Doroudian was making quarterly stock and option distributions to Ms. Miller-Rich at a $1.20 valuation, he issued 12,527,056 shares at a lower price, 5,255,558 of them for no consideration at all.  Since June 2016 Doroudian had issued 6,299,000 shares to himself or his wife for no consideration.  These manipulations, which were not disclosed to Ms. Miller-Rich, substantially reduced the value of her stock.

40.  Given the scope of the fraudulent dealings, directors Miller-Rich and Ardakani both decided to part ways with Altum and Doroudian.   By agreement dated June 9, 2020 (the "Settlement Agreement")(**Ex. B**), Ms. Miller-Rich agreed to resign and surrender her compensation and severance rights under the Employment Agreement subject to Altum's agreement to make certain payments to her.  She was to receive a cash payment of $400,000 payable in eight equal quarterly installments of $50,000 commencing June 30, 2020, together with a $45,000 payment for outstanding salary on or before July 31, 2020.  (§ 2).  This represented a substantial discount from what was due and owing under the Employment Agreement which included the short fall on the stock and option

distributions she had received based upon the inflated $1.20 pricing, the stock and option distributions owing for the first two quarters of 2020, $45,000 in salary due for the second quarter of 2020 and a $400,000 severance payment.  (Empl. Agmt., Sched B & § 7.1).  Altum subsequently refused to make any payments.

41.  With the dissenting directors out of the way, defendants were free to proceed with their scheme to divert the Covid-19 Opportunity to BetterLife.  On July 31, 2020, defendants, in furtherance of the conspiracy, caused Altum and BetterLife to enter into an Amalgamation Agreement (the "Amalgamation Agreement") pursuant to which Altum would become a wholly owned subsidiary of BetterLife.  In exchange for their shares, Altum shareholders would receive BetterLife shares equal to one-half of BetterLife's value.  By Offering Circular issued that same day (the "Offering Circular"), Altum's shareholders, including Ms. Miller-Rich, were solicited, in furtherance of the conspiracy, to approve the transaction at a July 29, 2020 special shareholder meeting.

42.  The Offering Circular was materially false and misleading as defendants then and there well knew.  These misrepresentations included, *inter alia*, that BetterLife was valued at or near $28.9 million (CND$36.1MM), that the transaction would be a "merger of equals," and that it would provide "better access to capital" (the "Offering Misrepresentations").

43.  At the shareholder meeting on July 29, 2020, defendants, in furtherance of the conspiracy, caused the Amalgamation Agreement to be approved by a 91.3% vote with Ms. Miller-Rich among the dissenters.

44.  Also in furtherance of the conspiracy, defendants caused a Form 2A Listing Statement dated August 26, 2020 ("Form 2A") to be publicly filed with the Canadian Securities Commission describing the transaction contemplated by the Amalgamation Agreement and its impending implementation.  The Form 2A represented, falsely and in furtherance of the conspiracy, that the valuation of Altum in connection with the transaction was determined by arm's length negotiation between BetterLife and Altum, that Altum's value at the time of the transaction was equivalent to BetterLife, that such transaction would be a "merger of equals," and that the transaction was valued at $19,485,932.80 (CAN$24,357.416)(the "Form 2A Misrepresentations").

45.  Contrary to the representations in the Offering Circular and Form 2A, and as defendants then and there well knew, Better Life was in dire financial straits, hardly Altum's "equal," and certainly in no position to make the substantial capital investment required to bring IFN a2b to market under an emergency use authorization.  As defendant Dattels wrote to BetterLife director Wolfgang Renz earlier in the year:

> [W]e have all sort of claims by [former CEO] Patrick Frankham, someone called Ali who has garnished $600k of our cash, [CEO] Russell Star's termination and others who have resigned or who may be let go.  Europe has been an unmitigated disaster.
>
> . . . .
>
> The iamhealth business has generated <$20k in gross income and we have nothing but a big hole in Europe with legal fees mounting and an unknown own future.
>
> . . . .

Let's batten down the hatches.  Our stock is 9 cents bid.  [CEO] Toni [Rinow] has resigned.  We have litigation everywhere.  We have former employees like Patrick trying to destroy us and now Toni is gone.  We have chaos in Montreal and a huge lease obligation.  We need to unwind California.  We have zero revenue so to speak.  We have devastated investors and if we don't turn this around fast the company will go under . . . . .

46. Indeed, in a sworn affidavit submitted to the Supreme Court of British Columbia on or about June 17, 2020, BetterLife CFO Ong averred that the company's financial circumstances were "extremely dire."  The company had been unable to pay rent for its sole manufacturing facility in Quebec for more than a year, its CEO had not taken salary in 2020, other officers had been forced to take 35% pay cuts, and capital would be fully depleted within a month.

47. The amalgamation was effectuated based upon the false and fraudulent misrepresentations of the Offering Circular and Form 2A without disclosure of these facts, in furtherance of the conspiracy, on August 31, 2020, whereupon the Altum shareholders surrendered their shares in exchange for publicly traded BetterLife shares.

48. Although Ms. Miller-Rich initially elected not to participate in the transaction and instead exercise her dissenting shareholders rights under Section 190 of the Canada Business Corporations Act, she withdrew the notice after being advised that Altum was unable to pay for the shares.  In reliance on the representations made in the Offering Circular and Form 2A, she elected instead to receive BetterLife shares in their place pursuant to the terms of the Amalgamation Agreement.   She tendered her 58,244 shares of Altum common stock by letter dated September 16, 2020, and received in return 25, 628 BetterLife shares.

49. Upon information and belief, defendants had the assistance of other co-conspirators who participated in or aided and abetted the frauds set forth above, including other investors, shareholders, directors and officers of defendant BetterLife and defendant Doroudian's Ismaili investor cohorts, who may have acted individually or through corporate or other investment vehicles, the present identities of whom or which are presently unknown to plaintiff.  These defendants are named herein as John and Jane Does 1-50 and ABC Corporations 1-20 until their identities may be determined through discovery or investigation.

50.  BetterLife's stock was trading at .14 at market close today.  Rather than the expected growth from a well-financed Covid-19 treatment roll-out, the former Altum shareholders are now just as "devastated" as the BetterLife shareholders.

**FIRST CLAIM—SECURITIES FRAUD—ALL DEFENDANTS**

51.  Plaintiff incorporates the foregoing allegations by reference herein.

52. By engaging in the conduct alleged in the complaint, including disseminating the Offering and Form 2A Misrepresentations containing materially false and misleading statements and omissions, defendants, directly or indirectly, singly or in concert, in connection with the purchase or sale of securities and by the use of means or instrumentalities of interstate commerce, or the mails, or the facilities of a national securities exchange, knowingly or recklessly have made one or more untrue statements of a material fact or omitted to state one or more material facts necessary in order to make the statements made, in light of the circumstances in which they were made, not misleading.

53. Plaintiff relied on defendants' representations to the market in electing to tender her shares.

54. By reason of the foregoing, defendants each violated Exchange Act Section 10(b), 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10.b-5, and plaintiff has been damaged in an amount to be determined at trial believed to be in excess of $2 million.

**SECOND CLAIM**
**AIDING AND ABETTING SECURITIES FRAUD**
**ALL DEFENDANTS SAVE BETTERLIFE**

55. Plaintiff incorporates the foregoing allegations of paragraphs 1-50, *supra*, by reference herein.

56. By engaging in the conduct alleged in the complaint, including disseminating the Offering and Form 2A Misrepresentations containing materially false and misleading statements and omissions, defendant BetterLife, directly or indirectly, singly or in concert, in connection with the purchase or sale of securities and by the use of means or instrumentalities of interstate commerce, or the mails, or the facilities of a national securities exchange, knowingly or recklessly have made one or more untrue statements of a material fact or omitted to state one or more material facts necessary in order to make the statements made, in light of the circumstances in which they were made, not misleading.

57. The defendants other than BetterLife knew, or were reckless in not knowing, that BetterLife was engaged in the unlawful conduct allege in the complaint, and they knowingly or recklessly substantially assisted and participated in the wrongdoing.

58. Plaintiff relied on defendants' representations to the market in electing to tender her shares.

59. By reason of the foregoing, pursuant to Section 20(e) of the Exchange Act, 15 U.S.C. § 78t(e), defendants aided and abetted BetterLife's violations of Exchange Act Section 10(b), 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10.b-5, and plaintiff has been damaged in an amount to be determined at trial believed to be in excess of $2 million.

## THIRD CLAIM—SECURITIES FRAUD—ALTUM/DOROUDIAN

60. Plaintiff incorporates the allegations of paragraphs 1-50, *supra*, by reference herein.

61. By engaging in the conduct alleged in the complaint, including disseminating the Altum Stock Misrepresentations containing materially false and misleading statements and omissions, defendants Altum and Doroudian, directly or indirectly, singly or in concert, in connection with the purchase or sale of securities and by the use of means or instrumentalities of interstate commerce, or the mails, or the facilities of a national securities exchange, knowingly or recklessly have made one or more untrue statements of a material fact or omitted to state one or more material facts necessary in order to make the statements made, in light of the circumstances in which they were made, not misleading.

62. Plaintiff relied on defendants' representations in continuing to remain employed at Altum and discharge her obligations under the Employment Agreement.

63.  By reason of the foregoing, defendants Altum and Doroudian each violated Exchange Act Section 10(b), 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10.b-5, and plaintiff has been damaged in an amount to be determined at trial believed to be in excess of $2 million.

## FOURTH CLAIM—FRAUD—ALL DEFENDANTS

64.  Plaintiff incorporates the allegations of paragraphs 1-50, *supra*, by reference herein.

65.  The Offering and Form 2A Misrepresentations were false and misleading.

66.  Defendants, directly or indirectly, singly or in concert, made the false Offering and Form 2A Misrepresentations with an intent to defraud plaintiff of her Altum stock interest.

67.  Plaintiff reasonably relied on these misrepresentations in tendering her Altum shares in connection with the Amalgamation Agreement.

68. As  a  direct  and  proximate  cause  of  defendants'  fraudulent misrepresentations plaintiff suffered damages, including the loss of value of her Altum shares.

69.  Defendants at all times acted willfully, wantonly and maliciously.

70.  By reason of the foregoing, plaintiff is entitled to compensatory damages in an amount to be determined at trial believed to be in excess of $2 million and punitive damages in an amount to be determined at trial believed to be in excess of $10 million.

## FIFTH CLAIM—FRAUD—ALTUM/DOROUDIAN

71.  Plaintiff incorporates the allegations of paragraphs 1-50, *supra*, by reference herein.

72.   The Altum Stock Misrepresentations were false and misleading.

73.  Defendant Altum and Doroudian, directly or indirectly, singly or in concert, made the false Altum Stock Misrepresentations with an intent to defraud plaintiff of the compensation justly due and owing to her under the Employment Agreement.

74.  Plaintiff reasonably relied on these misrepresentations in continuing her employment with Altum.

75.  As a direct and proximate cause of defendants' fraudulent misrepresentations, plaintiff suffered damages, including the loss of value of her Altum shares.

76.   Defendants at all times acted willfully, wantonly and maliciously.

77.   By reason of the foregoing, plaintiff is entitled to compensatory damages in an amount to be determined at trial believed to be in excess of $2 million and punitive damages in an amount to be determined at trial believed to be in excess of $10 million.

## SIXTH CLAIM—BREACH OF CONTRACT—ALTUM

78.  Plaintiff incorporates the allegations of paragraphs 1-50, *supra*, by reference herein.

79.   The Employment Agreement was a binding contract supported by valuable consideration.

80. Plaintiff fully and faithfully performed her obligations under the Employment Agreement.

81. Notwithstanding plaintiff's performance of the Employment Agreement, defendant Altum failed and refused to comply with its obligations to pay compensation to plaintiff as set forth therein.

82. Such compensation includes the short fall on the stock and option distributions she had received based upon the inflated $1.20 pricing, the stock and option distributions owing for the first two quarters of 2020, and a $400,000 severance payment.

83. Altum's refusal to pay the compensation due was in material breach of the Employment Agreement.

84. By reason of the foregoing, plaintiff is entitled to compensatory damages in an amount to be determined at trial believe to be in excess of $2 million.

## SEVENTH CLAIM—BREACH OF CONTRACT—ALTUM

85. Plaintiff incorporates the allegations of paragraphs 1-50, *supra*, by reference herein.

86. The Settlement Agreement was a binding contract supported by valuable consideration.

87. Plaintiff fully and faithfully performed her obligations under the Settlement Agreement.

88. Notwithstanding plaintiff's performance of the Settlement Agreement, defendant Altum failed and refused to comply with its obligations to make payments to

plaintiff in any respect following its execution.  Only after this action was filed was a partial $45,000 payment made in an effort to forestall this litigation.

89.    Altum's refusal to pay the compensation due was in material breach of the Settlement Agreement.

90.  By reason of Altum's material breach of the Settlement Agreement, Ms. Miller-Rich is entitled at her election to rescission and to seek recovery of the amounts due and owing under her Employment Agreement.

91.  Alternatively, she may seek recover of the amounts due under the Settlement Agreement.

92.  By reason of the foregoing, plaintiff is entitled to compensatory damages in an amount to be determined at trial believe to be in excess of $2 million.

WHEREFORE, plaintiff demands judgment against defendants, jointly and severally, awarding:

(1) compensatory damages in an amount to be determined at trial believed to be in excess of $2,00,000.00;

(2)  punitive damages in any amount to be determined at trial believed to be in excess of $10,000,000.00;

(3)    rescission of the Settlement Agreement or, in the alternative, compensatory damages in an amount to be determined at trial believed to be in excess of $2,00,000.00;

(3) costs and disbursements;

(4) attorney's fees;

(5) pre-judgment interest; and

(6) such other and further relief as is just and proper.

Dated:  New York, New York
        April 28, 2022

McCARNEY LAW P.C.

By _____
James G. McCarney
29 Broadway, 27th Floor
New York, New York 10006
(212) 797-1388
jmccarney@mccarneylaw.com

*Attorneys for Plaintiff*

24