Execution Version

THIS EMPLOYMENT AGREEMENT is agreed to be effective as of the 17th day of September, 2018.

BETWEEN:

    **ALTUM PHARMACEUTICALS INC.**, a corporation incorporated pursuant to the laws of Canada and having an address of 1275 West 6th Avenue, Vancouver, British Columbia V6H 1A6

    (the "**Employer**")

AND:

    **Nancy Miller-Rich**, an individual having an address of 55 Mt. Pleasant Road, Morristown, NJ, USA 07960

    (the "**Executive Chairman**")

WHEREAS:

A.    The Employer is a specialty pharmaceutical company engaged in the development of innovative therapeutics for women's health and oncology (the "**Business**");

B.    The Employee has represented that the Employee has skills and expertise that are required by the Employer for its operations;

C.    The Employer wishes to obtain and the Employee wishes to provide services to the Employer on the terms and conditions contained herein.

NOW THEREFORE, in consideration of the mutual covenants herein contained and other good and valuable consideration, the parties confirm and agree that the Employee's employment with the Employer is subject to the terms and conditions of this Agreement and are as follows:

ARTICLE 1 – EMPLOYMENT

1.1    Effective the date of this Agreement (the "**Start Date**"), the Employee will serve as the Executive Chairman of the Employer (the "**Executive Chairman**") as more fully described in Schedule A to this Agreement, and will perform the duties set out in Schedule A. In carrying out these duties and responsibilities, the Employee shall comply with all reasonable instructions as given by the Board of Directors of the Employer.

1.2    The Employee represents that his/her employment with the Employer does not violate any contractual provisions enforceable against the Employee and that the Employee's authority to enter into this Agreement is not restricted by any agreement between the Employee and any other party. The Employee agrees to indemnify the Employer from damage, loss, liability, cost or expense, including reasonable legal fees and expenses, caused directly or indirectly by the breach by the Employee of this covenant and the Employer's reasonable reliance upon such covenant.

- 2 -

1.3  The Employee recognizes and understands that in performing the duties and responsibilities of the Employee's employment as provided in this Agreement, the Employee will occupy a position of high fiduciary trust and confidence pursuant to which the Employee will develop and acquire wide experience and knowledge with respect to all aspects of the manner in which the Employer's business is conducted. Without limiting the generality of the foregoing, the Employee shall comply with all duties and obligations applicable to an officer and director under applicable law. In the performance of her duties hereunder, it is the intent and agreement of the Employee and of the Employer that such knowledge and experience shall be used in furtherance of the business interests of the Employer.

1.4  During the Employee's employment with the Employer, the Employee will:

   (a)  well and faithfully serve the Employer and use the Employee's commercially reasonable best efforts to promote the best interests of the Employer;

   (b)  unless prevented by ill health or injury, devote such time as reasonably necessary to carry out employees duties hereunder; and

   (c)  comply with the Employer's written policies and procedures that are communicated to Employee, as the same are in effect or as may be amended from time to time.

## ARTICLE 2 – SERVICE

2.1  During the term of the employment, the Employee shall devote him/herself to the Business of the Employer consistent with the standard set forth in Section 2.2.

2.2  It is understood by the parties that the hours of work involved will vary and may be irregular. The Employee agrees to work such hours as necessary to fulfill her obligations pursuant to this Agreement, within reason. It is currently contemplated that during the period through the first anniversary hereof, Employee will devote, on average, approximately 20 hours per week to the performance of her duties hereunder, and that such commitment will be reduced following such first anniversary.

## ARTICLE 3 – CONFIDENTIAL INFORMATION

3.1  The Employee acknowledges that in the performance of his/her obligations hereunder, he/she will acquire information about certain matters which are confidential to the Employer and which information is the exclusive property of the Employer, including but without limiting:

   (a)  supplier lists;

   (b)  pricing policies;

   (c)  records and statistics;

(d) any secret or trade secret or know-how of the Employer or any information relating to the Employer or to any person, firm or other entity with which the Employer does business which is not known outside of the Employer;

(e) sales and promotional policies;

(f) any information, process or idea not generally known outside of the Employer;

(g) financial information about the Employer;

(h) confidential personal remuneration and benefits and policies;

(i) programs, systems, packages, or software products or documentation thereof and other intellectual property rights of the Employer; and

(j) information about the Employer's customers or clients, its members or business partners;

(all of the foregoing herein referred to as "**Confidential Information**" including such information as a director, officer or senior employee of the Employer may from time to time indicate to the Employee as being included in the expression "Confidential Information").

3.2 The Employee acknowledges that such Confidential Information could be used to the detriment of the Employer. Accordingly, the Employee undertakes to treat all such Confidential Information confidentially and agrees not to disclose such information to any person, firm, association or corporation, assist any third party to do so or use such information for any purpose other than for the benefit of the Employer.

3.3 The Employee acknowledges that the Employer's suppliers, customers and clients may require the Employer, on its own behalf or on the behalf of its employees, to agree to various non-disclosure and confidentiality covenants regarding information supplied to the Employer by such third parties. The Employee agrees to comply with all such terms and conditions of any such covenants that are timely made known to Employee in writing and further agrees to indemnify the Employer from any damage, loss, liability, costs or expenses (including reasonable legal fees and expenses), caused in whole or in part by any material and intentional breach by the Employee of this covenant.

3.4 Any discoveries, ideas and suggestions, improvements or inventions of any character ("Discoveries") made or developed by the Employee in connection with the performance of Employee's services on behalf of the Employer, whether or not conceived or made during his/her regular working hours, or whether or not the Employee is specifically instructed to make or develop the same, shall be for the benefit of the Employer and shall be considered to have been made under and by virtue of this contract and shall immediately become the property of the Employer. Employer agrees and acknowledges that Employee is performing services hereunder on a part-time and non-exclusive basis and that any Discoveries arising in connection with the performance by Employee of services for other persons shall not be the property of the Employer.

- 4 -

3.5    The Employee will treat as confidential any knowledge of the Employer's formulae, specifications or secret processes or other Confidential Information he/she may acquire in the course of his/her employment and he/she will not, while in the employ of the Employer or at any time after the termination of his/her employment, divulge any information with respect to any formulae, specifications, methods or processes or other Confidential Information of the Employer or with respect to any other matter of a secret nature which may have come into his/her possession while in the employ of the Employer, or publish or cause to be published, or otherwise utilize, any subject-matter, except, however, as he/she may be authorized so to do in writing by the Board of Directors of the Employer.

## ARTICLE 4 – REMUNERATION AND BENEFITS

4.1    In consideration of the Employee's performance of the obligations contained herein the Employer shall, in accordance with its normal practices, pay to the Employee the remuneration and provide such benefits as set forth in Schedule B to this Agreement, provided that the Employee's salary shall be reviewed annually, with the first such reviews to commence by year end 2019 with each subsequent annual review to be held in January of each year.

4.2    In addition to the remuneration set forth in Schedule B, the Employee shall be entitled to paid vacation of 4 weeks per annum. Vacation shall be taken at such time or times as is mutually determined. Vacation time is earned in proportion to the amount of the year worked.

4.3    The Employer shall indemnify the Employee in respect of any claim, loss or liability incurred by the Employee in connection with the performance of her duties hereunder, to the fullest extent possible at applicable law, and in all events on terms and conditions as least favorable as the most extensive indemnification commitment provided by the Employer to any other officer or director of the Company. The Employer shall also maintain directors' and officers' liability insurance in an amount and on terms and conditions customary for a company in the same industry and of comparable size to the Employer. The Employer will expressly include the Employee as a covered insured under such policy, on terms and conditions no less favorable than the most favorable terms applicable to any other officer or director of the Employer.

4.4    The parties acknowledge and agree that any amounts to which the Employee is entitled to hereunder shall be less such deductions or amounts to be withheld as required by applicable law and regulations.

## ARTICLE 5 – EMPLOYER'S PROPERTY

5.1    The Employee understands and agrees that all items including, without limitation, programs, software, documentation, equipment, vehicles, books, manuals, records, files, customer lists, materials, reports and items of any and every kind or nature furnished, or which in the absolute discretion of the Employer may from time to time be furnished to the Employee by the Employer or created by the Employee pursuant to this Agreement shall remain and be considered the exclusive property of the Employer at all times, and shall be returned, together with all copies and/or other reproductions thereof, to the Employer in good condition promptly upon the request of the Employer at any time during the term of this Agreement, and forthwith

upon the termination, for any reason, of this Agreement. Upon termination of employment, the Employee will acknowledge and confirm, in writing, compliance with this provision.

5.2   If any writings or works of design or authorship created or prepared by the Employee in connection with the performance of her services hereunder that are not by operation of law works made for hire, the Employee hereby assigns to the Employer the ownership of all rights of copyright and all other proprietary rights in such items and the Employer shall have the right to obtain and hold in its own name rights of copyright, copyright registrations, trademark and trade name registrations and similar protection which may be available in the works.

## ARTICLE 6- CORPORATE OPPORTUNITIES

6.1   Any specific Employer transactions including product or company acquisitions, and licensing arrangements which the Employer is actively pursuing while the Employee is in the Employment of the Employer that come to the attention of the Employee shall be presented by the Employee to the Employer for its consideration on a right of first refusal basis. If the Employer does not elect to pursue such transaction and undertake affirmative action to pursue such transaction within 60 days of the date the potential transaction is presented by the Employee for consideration (or, if later, within 30 days following the provision of any additional information requested by the Employer within 10 days following such initial presentation that is necessary to evaluate the transaction), the Employee will be entitled to pursue such transactions alone or in combination with other persons.

## ARTICLE 7- TERMINATION

7.1   Subject to Article 7.2 below, the Employer may terminate the Employee's employment at any time without cause by providing the Employee a period of notice of termination of employment of twenty (24) months or such notice and payment as may be required by the *Employment Standards Act*, if any, whichever is greater. For greater certainty, if the Employee is terminated without cause, the Employee will receive a cash severance payment of twenty (24) months of annual salary.

7.2   If the Employer terminates the Employees' employment without cause after a Triggering Event (as defined below), then, at the option of the Employee, exercisable at any time within three (3) months after the date of the Triggering Event, the Employee may:

   (a)   elect to continue to be employed by the Employer in accordance with the terms of this agreement or any agreed to replacement contract, or

   (b)   give thirty (30) days notice in writing to the Employer that this agreement or any agreed to agreement has been terminated, in which event the Employer will pay to the Employee, a cash severance payment equal to 24 months of annual salary.

   (c)   For the purpose of this Article 7.2, "Triggering Event" is defined as:

      (i)   a take-over bid (as defined in the Securities Act (British Columbia)) which is successful in acquiring Common shares of the Company;

- 6 -

(ii) a change of control of the Board, which includes, but is not limited to:

   A. the election by the shareholders of the Company at any annual or special general meeting, of less than a majority of the persons nominated for election by management of the Company;

   B. the election by the shareholders of the Company at any annual or special general meeting of less than a majority of the persons nominated for election by the Company's then-incumbent board of directors; or

   C. the purchase or acquisition of shares of the Company and/or securities (the "Convertible Securities") convertible into shares of the Company or carrying rights to acquire shares of the Company, as a result of which a person, group of persons or persons acting jointly or in concert (collectively the "Holder") beneficially own or exercise control or direction over shares of the Company and/or Convertible Securities such that, assuming only the conversion of the Convertible Securities beneficially owned by the Holders, entitle them to cast more than fifty percent (50%) of the votes attaching to all of the shares of the Company which may be cast to elect directors;

(iii) the sale of all or substantially all the assets of the Company;

(iv) the sale, exchange or other disposition of a majority of the outstanding shares of the Company in a single or series of related transactions;

(v) the termination of the Company's business or the liquidation of its assets; or

(vi) the merger or amalgamation or other corporate restructuring of the Company in a transaction or series of transactions in which the Company's shareholders receive less than 51 percent of the outstanding shares of the new or continuing corporation.

7.3 It is acknowledged and agreed that the Employer may, at its sole option, elect to pay the Employee's salary over the course of the notice period in lieu of any notice required by this Agreement. The Employer represents and guarantees that the amounts payable pursuant to Articles 7.1, 7.2 or 7.3 herein shall not be less than that required pursuant to the notice and severance pay provisions of the *Employment Standards Act*, if any, provided that all such payments pursuant to the *Employment Standards Act* shall be deemed to be payments on account of amounts owing pursuant to Articles 7.1, 7.2 or 7.3 herein.

7.4 The Employee may terminate the Employee's employment with the Employer at any time, upon giving not less than ninety (90) days notice in writing to the Employer on the express condition that the Employer may waive any additional notice in excess of that required by the *Employment Standards Act*.

7.5   In the event of the death of the Employee before the expiration of the notice periods referred to in Articles 7.1, 7.2 and 7.3, except as expressly provided in Schedule B, the Employer shall have no further obligation to make any payments whatsoever except as may be required by the *Employment Standards Act*.

7.6   Upon termination of the employment, the Employer shall cooperate fully with the Employee should the Employee wish to convert to individual coverage any life insurance policies which the Employer maintained on the life of the Employee. At the request of the Employee the Employer shall provide any and all information in its possession with respect to any such plan that may assist the Employee in converting any such policy to individual coverage. The Employer shall maintain the Employee as a member of any health and/or dental group plan which existed on the date of such termination for the Notice Period, provided the plan permits such continuation and provided the Employee pays his/her individual premiums from the date of termination.

7.7   Notwithstanding anything to the contrary contained herein, the employment of the Employee may, at the option of the Employer, be terminated by the Employer, without notice or payment in lieu thereof, for cause. For the purpose of this Agreement "cause" shall mean:

   (1)   any breach of the provisions in Articles 3, 6 and 8 of this Agreement by the Employee,

   (2)   repeated material violation of instructions or publicized rules of the Employer,

   (3)   any other conduct of the Employee that is recognized as just cause under the law of Ontario.

7.8   Notwithstanding anything to the contrary contained herein, the employment of the Employee may, at the option of the Employee, be terminated by the Employee, without further notice, if the Employer shall breach any of the provisions in Article 4 of this agreement and shall have failed to cure such breach within five days after receipt by the Employer of a notice from the Employee asking the Employer to cure such breach. In the event that the Employee exercises her rights under this Section 7.8, such termination shall be deemed for purposes of this Agreement to be a termination of the Employee's employment by the Employer without cause.

7.9   The parties understand and agree that the giving of notice or the payment of severance pay by the Employer to the Employee upon termination shall not prevent the Employer from alleging cause.

ARTICLE 8 – HUMAN RIGHTS CODE

8.1   The Employer agrees that it will respect the Employee's right to equal treatment with respect to this Agreement without discrimination because of race, ancestry, place of origin, color, ethnic origin, citizenship, creed, sex, age, sexual orientation, record of offenses, marital status, family status or handicap in accordance with the Ontario *Human Rights Code*.

8.2   The Employee agrees to respect the rights of all other employees and agrees to equal treatment with respect to employment without discrimination because of race, ancestry, place of

- 8 -

origin, color, ethnic origin, citizenship, creed, sex, age, sexual orientation, record of offenses, marital status, family status or handicap in accordance with the Ontario *Human Rights Code*.

## ARTICLE 9 – SURVIVAL OF PROVISIONS

9.1   Notwithstanding any termination of this Agreement, and irrespective of the reasons for such termination, the provisions of Article 3, Article 5, Article 6 and Article 8 shall survive such termination and remain in full force and effect thereafter in accordance with their respective terms.

## ARTICLE 10 – SEVERABILITY

10.1   In the event that any provision or part of this Agreement is found to be void or invalid by a court, the remaining provisions, or parts thereof, shall be and remain in full force and effect.

## ARTICLE 11 – NOTICES

11.1   Any notice given or required to be given under this Agreement will be in writing and signed by or on behalf of the party giving it. Such notice may be served by priority post to the addresses of the parties noted on page one of this Agreement, or by fax, email or other electronic transmission. Any notice served will be deemed served upon receipt, and if mailed by priority post will be deemed served seventy two (72) hours after the time of posting, and if by electronic transmission, upon successful transmission.

## ARTICLE 12 – GOVERNING LAW

12.1   This Agreement will be governed by and construed in accordance with the laws of the Province of British Columbia. Each of the parties hereby irrevocably attorns to the jurisdiction of the Courts of Vancouver, British Columbia, with respect to any disputes arising out of this Agreement.

## ARTICLE 13 – CANADIAN FUNDS

13.1   Unless otherwise provided herein, dollar amounts referred to in this Agreement shall be in U.S. funds.

## ARTICLE 14 – ENTIRE AGREEMENT

14.1   This agreement constitutes the entire agreement between the parties with respect to the employment of the Employee and any and all previous agreements, written or oral, express or implied between the parties or on their behalf relating to the services of the Employee are hereby terminated and cancelled and each of the parties releases and forever discharges the other of an from all actions, causes of action, claims and demands whatsoever under or in respect of any such agreement. Any modification to this Agreement, except as provided for herein, must be in writing and signed by the parties or is shall be void and of no effect.

## ARTICLE 15 – WAIVER

15.1 Failure by the Employer or the Employee to rely on any provision in this Agreement in any given instance or instances shall not constitute a precedent or be deemed a waiver.

## ARTICLE 16 – HEADINGS

16.1 The headings utilized in the Agreement are for convenience only and are not to be construed in any way as additions or limitations of the covenants and agreements contained herein.

## ARTICLE 17 - ENUREMENT

This Agreement will enure to the benefit of and be binding upon the parties hereto and their respective heirs, executors, administrators, successors, personal representatives and permitted assigns.

## ARTICLE 18 – ASSIGNABILITY

18.1 This Agreement is personal to the Employee and may not be assigned by him.

18.2 Upon notice to the Employee this Agreement may be assigned to an affiliate of the Employer. Notwithstanding the foregoing, the obligation to issue to the Employee common stock shall not be assignable by the Employer except by operation of law.

18.3 For the purposes of this Article 19, "affiliate" has the meaning given thereto in the *Business Corporations Act*, 2002 (British Columbia).

18.4 Except as aforesaid, this Agreement shall enure to the benefit of and be binding upon the parties hereto and their respective successors and assigns, including, in the case of the Employee, her heirs, executors and administrators.

## ARTICLE 19 – INDEPENDENT LEGAL ADVICE

19.1 The Employee acknowledges that (a) she has read and understood this Agreement; and (b) has been given the opportunity to obtain independent legal advice in connection with this Agreement.

## ARTICLE 20 – SCHEDULES

20.1 Schedule A and Schedule B form part of this Agreement.

Where there is a conflict between the terms and provisions set out in the body of this Agreement and in the Schedules the terms and provisions set out in the Schedules shall govern.

- 10 -

IN WITNESS WHEREOF the parties hereunto have executed this agreement as of the 17 day of September, 2018.

**ALTUM PHARMACEUTICALS INC.**

Per: _____
Authorized Signatory

Name: Ahmad Doroudian

Title: CEO

**NANCY MILLER-RICH**

Execution Version

## SCHEDULE A

## JOB DESCRIPTION

**Position:** Executive Chairman

The scope of the Employee's employment shall include, but not be limited to the following:

1. To provide strategic guidance for the company and its assets in cervical HPV and Bone resorption due to cancer.

2. To support the CEO in creating an investor presentation and seeking investment funding of ~ $20 Million

The Employee's services shall generally be performed by the Employee in the United States, it being understood that the Employee will render services in Canada as and to the extent necessary to fulfill her duties and responsibilities hereunder.

1004742057v0

- 20-3 -

## SCHEDULE B

### EMPLOYEE'S REMUNERATION

The Employee shall be entitled to receive for each year of employment a salary equal to such amount as is agreed to by the Compensation Committee (and in the event there is no standing Compensation Committee, then as agreed to by the Board of Directors) of the Employer and the Employee, from time to time. It is agreed that the Employee will be paid a salary of $45,000 cash, $20,000 in common shares and $25,000 stock option per quarter starting September 17, 2018. The Employer shall also reimburse the Employee for her legal fees incurred in connection with the negotiation of this Agreement, up to a maximum of $10,000. All payments hereunder shall be in U.S. dollars. In addition, in 2018 and promptly following the execution hereof, the Company shall grant the Employee an immediately exercisable incentive stock option (within the meaning of Section 422 of the U.S. Internal Revenue Code having an exercise price equal to the fair market value of the common stock on the date of grant and a ten year term in respect of the greatest number of whole shares having a fair market value at grant equal to $50,000.

The Employer shall provide the Employee with a part-time assistant to assist the Employee in the performance of her duties hereunder. It is anticipated that such assistant will receive a salary at least equal to $5,000 per quarter, for a commitment of one day per week. If the assistant is assigned other duties and responsibilities by the Company over and above the work for the Employee, the compensation for the assistant will be proportionately increased.

If the event that the Employer enters into an agreement to effect an equity offering of common shares on or before year end 2019, that offering is closed within six months of such year end and the gross proceeds to the Employer arising from such offering equal or exceed US$23,000,000 then the Employer will issue to the Employee 1,658,479 shares of common shares of the Employer (the "Incentive Shares"). In the event that the offering results in gross proceeds of at least US$17,000,000, but less than $23,000,000, the number of shares to be issued to the Employee shall be determined by mathematical interpolation. If the agreement related to the equity offering is entered into while the Employee is providing services hereunder, or within 90 days thereafter, the Employee (or in the event of the Employee's death, the Employee's estate) shall receive the number of Incentive Shares determined in accordance with the foregoing provisions of this paragraph, regardless of the fact that her services shall have previously terminated.

At the election of the Employee, the Employer shall reduce the number of Incentive Shares to be issued to the Employee in accordance with this Schedule B by the smallest number of Incentive Shares having a value (determined at the date of issuance) at least equal to the income and employment taxes that the Employee would incur in connection with the receipt of the full allotment of such Incentive Shares and the Employer shall pay such cash amount to the applicable taxing authorities in respect of the Employee's liability in respect of such taxes.

100474205756