UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

NANCY MILLER-RICH,

                            *Plaintiff,*

        *- against -*

ALTUM PHARMACEUTICALS INC.,
BETTERLIFE PHARMA INC.,
AHMAD DOROUDIAN,
STEPHEN DATTELS,
KRISZTIAN TOTH,
JOSEPH MIMRAN,
JOHN AND JANE DOES 1-50 and
ABC CORPORATIONS 1-20,

                        *Defendants.*

**AMENDED
COMPLAINT**


**PLAINIFF DEMANDS
TRIAL BY JURY.**

Plaintiff Nancy Miller-Rich by her undersigned counsel, McCarney Law P.C., for her amended complaint alleges:

1. Plaintiff brings this action for damages arising from defendants' violations of the antifraud provisions of Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10.b-5, common law fraud and breaches of contract. Plaintiff seeks $2 million in compensatory and $10 million in punitive damages.

## PARTIES

2. Plaintiff Nancy Miller-Rich resides at 565 Broome Street, Apt. 22A, New York, NY 10013.

3. Upon information and belief, defendant Altum Pharmaceuticals Inc. ("Altum") is a corporation formed under the laws of Canada with an office at 1275 West 6th Avenue, Suite 300, Vancouver, BC V6H 1A6, Canada.

4. Upon information and belief, defendant BetterLife Pharma Inc. ("BetterLife") is a corporation formed under the laws of Canada with an office at 1275 West 6th Avenue, Suite 300, Vancouver, BC V6H 1A6, Canada.

5. Upon information and belief, defendant Ahmad Doroudian resides at 4172 Doncaster Way, Vancouver, BC V6S 1V9, Canada.

6. Upon information and belief, defendant Stephen Dattels resides at Lot 5, Lagomar Road, Palm Beach, FL 33480.

7. Upon information and belief, defendant Krisztian Toth, is a partner of the law firm of Fasken Martineau DuMoulin LLP with offices at Bay Adelaide Centre, 333 Bay Street, Suite 2400, Toronto, Ontario M5H 2T6.

8. Upon information and belief, defendant Joseph Mimran is resident of the City, County and State of New York.

9. Upon information and belief, defendants John and Jane Does 1 through 50 are individuals, the present identities of whom are unknown to plaintiff, who are party to defendants' fraudulent conspiracy as alleged below.

10. Upon information and belief, defendants ABC Corporations 1 through 20 are corporations, the present identities of which are unknown to plaintiff, which are party to defendants' fraudulent conspiracy as alleged below.

## JURISDICTION AND VENUE

11. This Court has federal question subject matter jurisdiction under 28 U.S.C. § 1331 and Section 27 of the Exchange Act, 15 U.S.C. § 78jaa, over the claims arising under the antifraud provisions of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10.b-5, and pendent jurisdiction over the common law fraud and breach of contract claims.

12. This Court has diversity jurisdiction under 28 U.S.C. § 1331 over the claims asserted in this action because the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and plaintiff is a citizen of New Jersey and defendants are citizens of either Canada, Bermuda or Florida.

13. Venue lies in respect of the federal securities law claims under Section 27 of the Exchange Act, 15 U.S.C. § 78jaa, because an act or transaction constituting the violation occurred in this District and defendants may be found or transact business here.

14. Venue lies under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the state law claims occurred in this District.

15. This Court has *in personam* jurisdiction over defendants pursuant to Fed. R. Civ. P. 4(k)(1)(A) because they would be subject to the jurisdiction of the courts of general jurisdiction of New York State where this Court is located. Such jurisdiction lies under the long-arm provisions of CPLR § 302(a)(1)-(3). Section (a)(1) jurisdiction obtains

because plaintiff's claims arise from the defendants, either directly or through their co-conspirator defendants, having transacted business within the State of New York, contracted to supply goods and services here in the form of financing, securities and pharmaceuticals, and entered into the Employment Agreement described below to be performed in New York, all as set forth below. Section (a)(2) jurisdiction lies because defendants, either directly or through their co-conspirators, committed tortious acts within this State from which plaintiff's claims arise, including without limitation their fraudulent misrepresentations concerning the Better Life and Altum stock prices and proposed amalgamation, fraudulent diversion of the Covid Opportunity, and fraudulent concealment of their scheme in this State, all as alleged herein. Section (a)(3) jurisdiction exists because defendants, either directly or through their co-conspirator defendants (1) have committed tortious acts without the State as alleged below causing injury to plaintiff within the State, and (2)(i) regularly do or solicit business, or engage in a persistent course of conduct or derive substantial revenue from goods used or consumed or services rendered, in the State of New York, or (ii) expect or reasonably should expect their fraudulent acts to have consequences within New York State and derive substantial revenue from interstate or international commerce.

16. This Court has *in personam* jurisdiction over defendants in respect of the federal securities law claims under Section 27 of the Exchange Act, 15 U.S.C. § 78jaa, because an act or transaction constituting the violation occurred in the United States and defendants may be found or transact business there.

17. Defendants, each of them, individually, or through the acts of their co-conspirator defendants described below, have committed overt acts in further of their fraudulent scheme within the State of New York, and are otherwise subject to jurisdiction in this Court based upon the acts and omissions of their co-conspirators.

18. In the event any defendant were not subject to *in personam* jurisdiction in the courts of general jurisdiction of New York State in respect of any federal claim, then exercising such jurisdiction would be proper under Fed. R. Civ. P. 4(k)(2) consistent with the United States Constitution and laws.

## FACTS

19. Prior to the events at issue, plaintiff Nancy Miller-Rich held upper-level management positions for thirty-five years in the pharmaceutical, biotech, and healthcare industries. She held senior management positions at Sandoz (now Novartis), Schering-Plough and Merck where she was a member of the Operating Committee responsible for launching several innovative products worldwide, including the breakthrough Gardasil vaccine for human papillomavirus ("HPV") and Keytruda immunotherapy for cancer. These medications reached millions of patients across the globe and created billions in shareholder value, with Keytruda alone generating some $18 billion annually. Ms. Miller-Rich received numerous corporate awards and accolades for her achievements industry wide and presently serves on Boards of Directors of three publicly traded pharmaceutical companies and two private biotech companies.

20. On June 7, 2018, defendant Doroudian sought Ms. Miller-Rich out during the Jeffries Healthcare Conference at the Grand Hyatt in Manhattan to request a private

meeting. Doroudian was Chairman and CEO of defendant Altum, a start-up private biopharmaceutical company engaged in clinical development of new products for treatment of HPV and cancer in which Ms. Miller-Rich had particular expertise. Doroudian was looking to New York Venture Capital firms, bankers and pharmaceutical investors to underwrite its efforts to obtain FDA approval for use of interferon alpha 2b ("IFN a2b") for treatment of HPV and a gallium-based anti-cancer agent ("AP-002"). Ms. Miller-Rich's experience and profile in the industry would greatly enhance his ability to attract investors.

21. During the meeting held later that day Doroudian aggressively recruited Ms. Miller-Rich to assist with Altum's efforts to gain funding for the development of its two pipeline products for the U.S. market. He was especially keen to move forward with the development of IFN a2b as an HPV treatment. Merck was the innovator of IFNa2b and had obtained U.S. approval to market the drug under the brand name Intron-A to treat Hepatitis B & C. To obtain U.S. Food and Drug Administration ("FDA") approval for a new indication for IFNa2b, Altum would need to demonstrate biosimilarity to the reference compound, Intron-A. Ms. Miller-Rich's close relationships with key personnel at Merk would be invaluable.

22. Doroudian represented himself to have a breadth of experience in the pharmaceutical industry and to have held senior positions at several supposedly prominent concerns. Unbeknownst to Ms. Miller-Rich, and as would later be revealed, Doroudian had indeed held senior positions at nearly a dozen firms during his career, but mostly short-term stints at start-up concerns. He left one of these positions, CEO of pharmaceutical

manufacturer Pangeo (USA) Corp. ("Pangeo'), after his auditors resigned during a joint investigation by the Royal Canadian Mounted Police and US Drug Enforcement Administration into unlawful distribution of Pangeo's 60mg pseudoephedrine tablets used in illegal methamphetamine labs.

23.  Doroudian proposed that Ms. Miller-Rich join Altum as a part-time consultant in the New York Metropolitan area to assist with fundraising, product development and sourcing IFN a2b material from her former employer Merck.  Later that day, and over the ensuing forty-eight hours—while Doroudian was still in New York— they exchanged emails and a form of agreement setting forth the material terms of the consulting arrangement, including a three-month term for $75,000 in compensation payable half in cash and half in Altum shares.

24.  On June 13, 2018, Doroudian emailed a copy of the agreed upon consulting agreement dated as of June 11, 2018 (the "Consulting Agreement") (**Ex. A**) executed by him to Ms. Miller-Rich for countersignature and return.  She received and accessed the email and Consulting Agreement at the home office of her residence in Soho, Manhattan (the "Soho Office"),

25.  Before signing, Ms. Miller-Rich requested clarification regarding the value of the shares she would be receiving.  On July 18, 2018 defendants Doroudian and Altum, through their agent, Altum CFO Moira Ong, sent an email to Ms. Miller-Rich in which they represented, falsely, that the 30,000 Altum shares would satisfy the $37,500 stock component of her compensation owing under the Consulting Agreement (the "Consulting Agreement Shares").  This calculation was represented to be predicated on a recent

valuation of Altum made in connection with its acquisition of Lexi Pharma company in April 2018. The email was received and reviewed by Ms. Miller-Rich at the Soho Office.

26. As defendants Doroudian and Altum then and there knew, this representation was false and fraudulent because Doroudian had been secretly diluting the value of the Altum stock by issuing shares to himself and others for no, little or far less consideration. In fact, 30,000 shares of Altum stock were worth only a fraction of the $37,500 owing.

27. In reliance on the representations of Altum and Doroudian that she would be fully compensated with cash and stock, Ms. Miller-Rich fully performed her obligations under the Consulting Agreement. Acting on Altum's behalf, she reached out to her contacts in the New York biotech investment community regarding funding for Altum as well as her colleagues at Merck regarding sourcing Intron-A to establish IFNa2b biosimilarity. She obtained a preliminary commitment from Merck for access to Intron-A which Doroudian valued at $2.4 million.

28. On June 27, 2018, she met in person with Doroudian—who was once again in New York—and Altum COO Hooschmand Sheshbaradaran at the Grand Hyatt in Manhattan to work on Altum's investor presentation. During the meeting, Doroudian aggressively recruited Ms. Miller-Rich to stay on with Altum following expiration of the consultancy and become a member of his "team."

29. Doroudian continued to recruit Ms. Miller-Rich during phone calls to her at her Soho Office and Morristown, New Jersey residence over the course of the summer. He was so pleased with her efforts during the three-month consultancy period that he asked

her to join the Board of Directors as Executive Chairman. The arrangement was formalized in a written employment agreement effective as of September 17, 2018 (the "Employment Agreement")(**Ex. B**).

30. Altum was represented in connection with the negotiation of the Employment Agreement by Steward Muglich, Esq. of Alexander Holburn Beaudin + Lang LLP in Vancouver; Ms. Miller-Rich by Laurence K. Cagney, Esq., of Debevoise & Plimpton in Manhattan. During the negotiations, counsel exchanged drafts of the Employment Agreement via email to and from attorney Cagney's offices in Manhattan.

31. Doroudian transmitted the final agreement executed by him to Ms. Miller-Rich via email on November 8, 2018 which she received, accessed and reviewed at the Soho Office. Ms. Miller-Rich subsequently countersigned and returned the fully executed Employment Agreement by regular mail on November 10, 2018 with a copy via email the following day. The countersignature and deliveries via regular mail and email all occurred in or in the vicinity of the Soho Office.

32. By reason of the email transmission by Altum and Doroudian of the partially executed Employment Agreement to Ms. Miller-Rich to her Soho Office, and her subsequent execution at and deliveries from there, defendant Altum became irrevocably liable within the United States to deliver the Altum shares specified therein to Ms. Miller-Rich in a domestic transaction under Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), Rule 10b-5 thereunder.

33. Under the Employment Agreement, Ms. Miller-Rich would provide strategic guidance to the Company for the development of its HPV and cancer drugs and

assist CEO Doroudian in securing another $20 million round of investor funding. (Empl. Agmt., Sched. A). She would continue to be based in lower Manhattan where she resided and work on Altum matters approximately 20-hours per week. (§ 2.2). Although she would make herself available in Canada as needed, her services would be performed "generally . . . in the United States" and she would be paid in US currency. (Sched. A & § 13.1). Her initial compensation was set at $410,000, including a $50,000 signing bonus payable in immediately exercisable stock options, as well as $180,000 in salary, $80,000 in stock and $100,000 in options, each payable in equal quarterly installments. (Sched. B). The British Columbia choice of forum clause was non-exclusive. (§ 12.1).

34. Ms. Miller-Rich thereafter fully performed her obligations under the Employment Agreement. Over seventy meetings were held, more than twenty of which occurred in New York, to progress US market interest and funding for both IFN a2b as an HPV treatment and AP-002 as an anti-cancer drug. No meetings were conducted in Canada. Her former colleagues at Merk provided Altum with access to Doroudian's $2.4 million in Intron-A at no cost to demonstrate biosimilarity to the FDA.

35. Ms. Miller-Rich also formulated an investor presentation and worked with the development team, many of them U.S. employees, consultants and companies. She targeted nearly one hundred Venture Capital investors as potential sources of funding.

36. At Doroudian's direction, Ms. Miller-Rich primarily focused her efforts on the U.S. market. Her strategic analysis, valuation and forecasting work were all tailored toward the needs of American venture capital firms and pharmaceutical companies. She targeted the New York City and New Jersey market with which she was most familiar. The

approval process involved on-going discussions with the FDA. Clinical work was to be performed in the United States as the leading medical experts in the field were located at American universities.

37. Defendant Doroudian was himself an active participant in both US and New York targeted business initiatives. He travelled to New York on Altum business for twenty-five in person meetings with Ms. Miller-Rich in Manhattan during her first year, including investor presentations to Jeffries, Arche, Torryea Partners, Leerink, Venrock, Octagon Capital, Oppenheimer, Federated Hermes and Invus. During one of the meetings, Doroudian observed that he spends so much time at the Concorde Hotel in Manhattan "they should give me birthday presents."

38. On December 6, 2018, Doroudian joined Ms. Miller-Rich for a luncheon meeting in Manhattan with Oscar Bekk, a partner in Ortac AG, a Zurich-based investment firm representing wealthy European investors. After the meeting, Doroudian stated that Beck was so favorably impressed with her presentation that he gave the green light for an additional $ 2.6 million in funding for Altum.

39. On January 16, 2019, Doroudian joined Ms. Miller-Rich and her husband for dinner at their Soho apartment in Manhattan. He would later comment about her Soho residence: "Altum's New York Office has a great view."

40. In recognition of her achievements and as required under the Employment Contract, Altum made the quarterly $45,000 salary payments to Ms. Miller-Rich for the last quarter of 2018 and all four quarters of 2019 as required, but thereafter failed and refused to make further salary payments without justification or explanation.

41. Altum further purported to comply with its obligations under the Employment Agreement to make quarterly distributions of $20,000 in Altum common stock and $25,000 in options for the last quarter of 2018 and all four quarters of 2019 as required, but thereafter failed and refused to make quarterly share distributions without justification or explanation. The distributions were all calculated at a stock price of $1.20/share which Altum and Doroudian represented to be the fair market value of such shares.

42. Ms. Miller-Rich reasonably relied on the misrepresentations of Altum and Doroudian regarding the fair market value of the Consulting Agreement Shares and quarterly common stock and option distributions (the "Altum Stock Misrepresentations") and continued to perform her obligations under the Employment Agreement fully and faithfully in reliance thereon.

43. In fact, as revealed by internal Altum corporate records to which Ms. Miller-Rich would later gain access as described below, and as Altum and Doroudian both then and there well knew, the fair market value of Altum shares was only a fraction of the $1.20 price used to calculate the quarterly distributions to Ms. Miller-Rich. Had a true and correct valuation been utilized, Ms. Miller-Rich would have received a far greater number of shares. The diminution in value resulted from Doroudian's systematic (1) payment of finder's fees to his friends for sourcing new investors with Altum shares at no cost, (2) issuance of Altum shares to himself for no consideration which he in turn would sell to Altum investors at a higher price to facilitate his diversion of these new investments to himself, and (3) issuance of shares to other investors at much lower prices, many for no

consideration whatsoever. Many of Doroudian's friends were acquaintances from the Iranian Ismaili community in Vancouver which served as a source for investors for him, including investors in defendant BetterLife.

44. On March 25, 2020, shortly after the Covid pandemic was declared a national emergency in the US, Altum Chief Medical Officer Angela Ogden reported to the Altum Board that Wuhan China was utilizing IFN a2b in an inhaler form for treatment of Covid-19. At the time the three-person board consisted of Doroudian, Ms. Miller-Rich and Ali Ardakani. Ardakani had been responsible for bringing the gallium-based anti-cancer opportunity and the pharmaceutical development team to Altum. The board immediately recognized the opportunity to seek FDA approval of Altum's IFN a2b as a Covid-19 treatment on an emergency use authorization basis. The potential for Altum to help patients, responsibly gain approval and realize significant profits in the short-term from IFN a2b (the "Covid Opportunity") was manifest. The Altum shareholders stood to reap substantial profits from the news and eventual sales.

45. Doroudian, however, had other plans. He was also a major shareholder in a penny-stock cannabis company he had co-founded, defendant BetterLife. The shares of BetterLife (formerly Pivot Pharmaceuticals Inc.) had publicly traded on the United States Over the Counter ("OTC") market since 2002 under the trading symbol BETR and had more recently been listed on the Canadian Stock Exchange ("CSE"). More than 56 million shares—nearly one-third of those outstanding—were owned by U.S. investors as of July 2019.

46. After a series of acquisitions, BetterLife was focusing on cannabis laced tablets, capsules, soft gels and beverages as well as edible mints and candies and intimate lubricants. Doroudian had brought in many of his cronies from the Ismaili community as early investors who stood to reap substantial benefits together with Doroudian should its share price escalate dramatically.

47. In May 2019, Doroudian had secured a substantial participation in BetterLife from investment partnership High Park Ventures led by billionaire Stephen Dattels accompanied by his long-time Toronto-based counsel, Krisztian Toth, and New York marketing and branding expert Joseph Mirman (collectively the "Hyde Park Defendants"). The Hyde Park Defendants and their investor group had assumed control of BetterLife pursuant to an undisclosed governance agreement dated May 10, 2019. Under the agreement, the Hyde Park Defendants had control of the Better Life board for a two-year period with defendant Toth assuming the position of Chairman. With the Hyde Park Defendants' substantial holdings, which included warrants to obtain even greater control, they stood to reap a windfall from a dramatic increase in BetterLife's stock price, all but a certainty should BetterLife secure control of the Covid Opportunity.

48. Defendant Doroudian was relegated to a non-voting observer position on the BetterLife board under the governance agreement. Although not a board member, defendant Dattels as the lead investor exercised *de facto* control of the company assisted by defendants Toth and Mirman. Toronto—less than twenty-five miles from the New York border—became the command center for Better Life's operations with defendant Toth conducting board meetings and directing necessary legal work there with his firm. Dattels

had a nearby horse farm in Toronto as well as a mansion in Palm Beach Florida from which he directed Toth, Mimran and Doroudian. Mimran split his time between his residences in New York and Toronto and would utilize his and Dattels' valuable connections with New York public relations and advertising resources.

49. After being apprised of the Covid Opportunity by Doroudian, Dattels sent an April 6, 2020 email to Toth, Mirman and Doroudian stating that Better Life was "on the road to being broke," "we have zero revenue" and "could do worse than bringing [the Covid Opportunity] into BETR."

50. Thereafter, defendants, each of them individually and together, thereafter combined, conspired confederated and agreed to divert the Covid Opportunity from Altum to Better Life and themselves. It was an object of the conspiracy, and means of its commission, that the Covid Opportunity would be diverted from Altum's shareholders at less than fair value by whatever means possible. It was a further object of the conspiracy, and means of its commission, that the transfer of the Covid Opportunity to BetterLife would increase its stock price for the benefit of defendants at the expense of Altum's other shareholders.

51. Two days later, on April 8, 2020, Dattels in furtherance of the conspiracy instructed Doroudian to have Altum file a patent application for the IFN a2b and enter into a deal with Better Life to transfer the asset. He noted that if the application were successful "BETR will be worth a fortune and you win big." To increase his own profits and those of Toth and Mimran, he also directed Toth to facilitate repricing of their Better Life warrants to lower the strike price and increase their profits.

52.   By email dated April 13, 2020, Dattels directed Toth, Mimran and Doroudian to implement a share restructuring that would ensure greater profits to the Hyde Park Defendants:

> This needs to come with a consolidation of the share capital and a reduction of the warrant pricing. With almost 300mm shares FD a $100mm mkt cap = 30 cents. I like the deal but we need to be smart. The people who need to recover are the folks we brought in at .25 for $15mm. If we consolidate the stock 10:1 and drop the warrant price to a pre money valuation of $20mm (basically even higher than the current mkt price) we solve the problem. Krisztian call me re this

Dattels' directives were implemented in furtherance of the conspiracy.

53.   By email dated April 16, 2020 to Toth, Mimran and Doroudian, Dattels directed the preparation of an agreement "for BETR to acquire the rights to IFN a2b from Altum," that a Better Life board meeting be called for that purpose, that the strike price on the Hyde Park Defendants' warrants be lowered and that a press release be prepared for issuance.  These directives were likewise implemented in furtherance of the conspiracy.

54.   By email dated April 24, 2020 to Dattels, Mimran and Doroudian, Toth sent a draft of a letter of intent ("LOI") effectuating the Covid asset transfer.  Contrary to the industry standard for such transactions which would require a substantial upfront cash component, the transaction involved payment in BetterLife stock and warrants which would be of little use in Altum's development efforts and detrimental to Altum's scientific credibility.  At Dattels' instruction, BetterLife reserved to itself unilateral rights to cancel the transaction should it not be able to secure its own financing for IFN a2b development efforts as it did not itself have the necessary capital.

55.   Dattels, Toth, Mimran and Doroudian exchanged a series of emails over the next several days with revisions to the LOI.  By email dated May 3, 2020 to Toth, Mimran and Doroudian, Dattels directed that the final version be executed, the press release be finalized for issuance, and that Doroudian conduct a board meeting to approve the deal.

56.   Recognizing that Doroudian himself was hopelessly conflicted in respect of the transaction given his dual status with both companies as an officer and major shareholder, Toth's initial draft of the LOI provided for signature by Ms. Miller-Rich as Chairman on behalf of Altum.  Knowing full well that Ms. Miller-Rich would never agree to such a deal, Doroudian had the Altum general counsel to change the Altum signatory to Doroudian himself.  Doroudian executed the LOI on Altum's behalf on the afternoon of May 6, 2020.  Although his fellow Altum board members had no inkling of the transaction, the LOI by its terms was fully binding even in the absence of the more formal license agreement that was contemplated therein.

57.   Upon learning that Ms. Miller-Rich had refused to sign and that Doroudian was signing the LOI notwithstanding his blatant conflict of interest, Toth, conscious of the conflict and fully aware of the potential liability, resigned as Better Life's Chairman before the transaction was consummated.

58.   Later on May 6, 2020 at 7:30 pm, Doroudian sought approval from Altum directors Miller-Rich and Ardakani of the LOI.  This was the first they learned of defendants' scheme to divert the Covid Opportunity.  As it was immediately apparent that Doroudian was breaching his fiduciary duties to the company by secretly arranging to

license Altum's most valuable asset at a fraction of its value, the resolution was summarily rejected.

59. That same day, and notwithstanding the Altum board's rejection of the LOI, BetterLife issued a press release announcing that it had secured a license to Altum's IFN a2b rights which it planned to market as a potential Covid-19 treatment under the trade name "AntiCovir." The term, coined by Doroudian at Dattels' encouragement, blatantly violated the FDA prohibition against marketing an unapproved drug.

60. By email dated May 11, 2020, Mimran introduced Dattels to Bulent Pakdil of Hampton Securities to explore a potential investment in the Covid Opportunity. Mimran touted Dattels as having "been instrumental in putting the BLife therapeutics transaction together."

61. After further investigation of Doroudian's self-dealing, Ms. Miller-Rich and Mr. Ardakani by majority vote of the Altum board on May 21, 2020 suspended both Doroudian and Chief Financial Officer ("CFO") Moira Ong and terminated the General Counsel Stuart Muglich. The board subsequently retained Blakes firm as outside counsel to assist with their investigation.

62. Review of Doroudian's email account and the financial records maintained by CFO Ong revealed widespread self-dealing and stock dilution by Doroudian. Nearly 450,000 shares of Altum common stock had been distributed to various finders at no cost which served both to offset the amount of the investment and to dilute the stock price. Doroudian issued more than 1.1 million shares in Altum common stock and made cash payments of nearly $1.6 million to finders sourcing Altum investments. During the same

period Doroudian was making quarterly stock and option distributions to Ms. Miller-Rich at a $1.20 valuation, he issued 12,527,056 shares at a lower price, 5,255,558 of them for no consideration at all. Since June 2016 Doroudian had issued 6,299,000 shares to himself or his wife for no consideration. These manipulations, which were not disclosed to Ms. Miller-Rich, substantially reduced the value of her stock.

63. Given the scope of the fraudulent dealings, directors Miller-Rich and Ardakani both decided to part ways with Altum and Doroudian. By agreement dated June 9, 2020 (the "Settlement Agreement")(**Ex. C**), Ms. Miller-Rich agreed to resign and surrender her compensation and severance rights under the Employment Agreement subject to Altum's agreement to make certain payments to her. The agreement once again contained non-exclusive British Columbia choice of forum clause. (§ 9). Ms. Miller-Rich was to receive a cash payment of $400,000 payable in eight equal quarterly installments of $50,000 commencing June 30, 2020, together with a $45,000 payment for outstanding salary on or before July 31, 2020. (§ 2). This represented a substantial discount from what was due and owing under the Employment Agreement which included the short fall on the stock and option distributions she had received based upon the inflated $1.20 pricing, the stock and option distributions owing for her consultancy and the first two quarters of 2020, $45,000 in salary due for the second quarter of 2020 and a $400,000 severance payment. (Empl. Agmt., Sched B & § 7.1). Altum subsequently refused to make any payments.

64. With the dissenting directors out of the way, defendants were free to proceed with their scheme to divert the Covid Opportunity to BetterLife. On June 4, 2020, in furtherance of the conspiracy, Better Life issue a press release stating that it was proceeding

with the acquisition of Altum notwithstanding the board opposition as it had the support of 67.12% of the Altum shareholders. The release represented, falsely, that the transaction would be a "merger of equals" through which Altum's shareholders would receive Better Life shares valued at $36.1 million. Defendant Doroudian, as Better Life's chief executive officer, was listed as the contact person. The release was widely disseminated throughout the CSE and OTC markets for publication to US investors generally and to Ms. Miller-Rich in New York in particular.

65. Also in furtherance of the conspiracy, defendants issued a press release on June 11, 2020, restating that the "merger of equals" deal was on track based upon a $36.1 million valuation. Doroudian was listed as Better Life's CEO and also as Altum's sole board member responsible for securing approval of the transaction by the Altum shareholders. The release was again widely disseminated throughout the financial markets, including to US and New York investors. The release was also filed with a Form 51-102F3 material disclosure statement (the "Form 51") on the electronic SEDAR system based in Montreal, the Canadian analogue of EDGAR for public company disclosures.

66. By Offering Circular dated July 3, 2020 (the "Offering Circular"), Altum's shareholders, including Ms. Miller-Rich, were solicited, in furtherance of the conspiracy, to approve an amalgamation with Better Life at a July 29, 2020 special shareholder meeting.

67. The Offering Circular was materially false and misleading as defendants then and there well knew. These misrepresentations included, *inter alia*, that BetterLife

was valued at or near $28.9 million (CND$36.1MM), that the transaction would be a "merger of equals," and that it would provide "better access to capital."

68. In furtherance of the conspiracy, on July 23, 2020, less than a week prior to the Altum shareholder vote, defendants, through their New York-based investor relations firm BDA International, Inc. published an article dateline "New York City" which described BetterLife as "an emerging biotechnology company currently preparing its own interferon-based treatment trials" as a result of the impending "merger of equals" with Altum. As defendants then and there well knew, this statement was false.

69. At the shareholder meeting on July 29, 2020, defendants, in furtherance of the conspiracy, caused the Amalgamation Agreement to be approved by a 91.3% vote of the Altum shareholders with Ms. Miller-Rich among the dissenters.

70. Also in furtherance of the conspiracy, defendants caused a Form 2A Listing Statement dated August 26, 2020 ("Form 2A") to be publicly filed with the Canadian Securities Commission through SEDAR. After describing the transaction contemplated by the Amalgamation Agreement and its impending implementation, the Form 2A represented, falsely and in furtherance of the conspiracy, that the valuation of Altum in connection with the transaction was determined by arm's length negotiation between BetterLife and Altum, that Altum's value at the time of the transaction was equivalent to BetterLife, that such transaction would be a "merger of equals," and that the transaction was valued at $19,485,932.80 (CAN$24,357,416).

71. Contrary to the representations in the press and public filings set forth above, and as defendants then and there well knew, Better Life was in dire financial straits,

hardly Altum's "equal," and certainly in no position to make the substantial capital investment required to bring IFN a2b to market under an emergency use authorization. As defendant Dattels had written to BetterLife director Wolfgang Renz earlier in the year:

> [W]e have all sort of claims by [former CEO] Patrick Frankham, someone called Ali who has garnished $600k of our cash, [CEO] Russell Star's termination and others who have resigned or who may be let go. Europe has been an unmitigated disaster.
>
> . . . .
>
> The iamhealth business has generated <$20k in gross income and we have nothing but a big hole in Europe with legal fees mounting and an unknown own future.
> . . . .
>
> Let's batten down the hatches. Our stock is 9 cents bid. [CEO] Toni [Rinow] has resigned. We have litigation everywhere. We have former employees like Patrick trying to destroy us and now Toni is gone. We have chaos in Montreal and a huge lease obligation. We need to unwind California. We have zero revenue so to speak. We have devastated investors and if we don't turn this around fast the company will go under . . . . .

72. Indeed, in a sworn affidavit submitted to the Supreme Court of British Columbia on or about June 17, 2020—just two weeks prior to dissemination of the fraudulent Offering Circular—BetterLife CFO Ong averred that the company's financial circumstances were "extremely dire." The company had been unable to pay rent for its sole manufacturing facility in Quebec for more than a year, its CEO had not taken salary in 2020, other officers had been forced to take 35% pay cuts, and capital would be fully depleted within a month.

73. On July 31, 2020, defendants, in furtherance of the conspiracy, caused Altum and BetterLife to enter into the Amalgamation Agreement (the "Amalgamation

Agreement") pursuant to which Altum would become a wholly owned subsidiary of BetterLife.

74. The amalgamation was effectuated on August 31, 2020 based upon the false and fraudulent misrepresentations of the Offering Circular, press releases and public filings, in furtherance of the conspiracy, whereupon the Altum shareholders surrendered their shares in exchange for publicly traded BetterLife shares.

75. Although Ms. Miller-Rich initially elected not to participate in the transaction and instead exercise her dissenting shareholders rights under Section 190 of the Canada Business Corporations Act, she withdrew the notice after being advised that Altum was unable to pay for the shares. In reliance on the representations made in the Offering Circular, press releases and public filings, she elected instead to receive BetterLife shares in their place pursuant to the terms of the Amalgamation Agreement. She tendered her 58,244 shares of Altum common stock by letter dated September 16, 2020, and received in return 25,628 BetterLife shares.

76. Upon information and belief, defendants had the assistance of other co-conspirators who participated in or aided and abetted the frauds set forth above, including other investors, shareholders, directors and officers of defendant BetterLife and defendant Doroudian's Ismaili investor cohorts, who may have acted individually or through corporate or other investment vehicles, the present identities of whom or which are presently unknown to plaintiff. These defendants are named herein as John and Jane Does 1-50 and ABC Corporations 1-20 until their identities may be determined through discovery or investigation.

77. BetterLife's stock was trading at twelve cents at market close today. Rather than the expected growth from a well-financed Covid-19 treatment roll-out, the former Altum shareholders are now just as "devastated" as the BetterLife shareholders.

## FIRST CLAIM—SECURITIES FRAUD—ALTUM/DOROUDIAN

78. Plaintiff incorporates the foregoing allegations by reference herein.

79. By engaging in the conduct alleged herein, including disseminating the Altum Stock Misrepresentations containing materially false and misleading statements and omissions, defendants Altum and Doroudian, directly or indirectly, singly or in concert, in connection with the purchase or sale of securities and by the use of means or instrumentalities of interstate commerce, or the mails, or the facilities of a national securities exchange, knowingly or recklessly have made one or more untrue statements of a material fact or omitted to state one or more material facts necessary in order to make the statements made, in light of the circumstances in which they were made, not misleading.

80. Plaintiff relied on defendants' representations in continuing to remain employed at Altum and discharge her obligations under the Employment Agreement.

81. By reason of the foregoing, defendants Altum and Doroudian each violated Exchange Act Section 10(b), 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10.b-5, and plaintiff has been damaged in an amount to be determined at trial believed to be in excess of $2 million.

## SECOND CLAIM—FRAUD—ALL DEFENDANTS

82. Plaintiff incorporates the foregoing allegations by reference herein.

83. The misrepresentations in the Offering Statement, press releases and public filings were false and misleading.

84. Defendants, directly or indirectly, singly or in concert, made these false misrepresentations with an intent to defraud plaintiff of her Altum stock interest.

85. Plaintiff reasonably relied on these misrepresentations in tendering her Altum shares in connection with the Amalgamation Agreement.

86. As a direct and proximate cause of defendants' fraudulent misrepresentations plaintiff suffered damages, including the loss of value of her Altum shares.

87. Defendants at all times acted willfully, wantonly and maliciously.

88. By reason of the foregoing, plaintiff is entitled to compensatory damages in an amount to be determined at trial believed to be in excess of $2 million and punitive damages in an amount to be determined at trial believed to be in excess of $10 million.

## THIRD CLAIM—FRAUD—ALTUM/DOROUDIAN

89. Plaintiff incorporates the foregoing allegations by reference herein.

90. The Altum Stock Misrepresentations were false and misleading.

91. Defendant Altum and Doroudian, directly or indirectly, singly or in concert, made the false Altum Stock Misrepresentations with an intent to defraud plaintiff of the compensation justly due and owing to her under the Employment Agreement.

92. Plaintiff reasonably relied on these misrepresentations in continuing her employment with Altum.

93. As a direct and proximate cause of defendants' fraudulent misrepresentations, plaintiff suffered damages, including the loss of value of her Altum shares.

94. Defendants at all times acted willfully, wantonly and maliciously.

95. By reason of the foregoing, plaintiff is entitled to compensatory damages in an amount to be determined at trial believed to be in excess of $2 million and punitive damages in an amount to be determined at trial believed to be in excess of $10 million.

## FOURTH CLAIM—BREACH OF CONTRACT—ALTUM

96. Plaintiff incorporates the foregoing allegations by reference herein.

97. The Employment Agreement was a binding contract supported by valuable consideration.

98. Plaintiff fully and faithfully performed her obligations under the Employment Agreement.

99. Notwithstanding plaintiff's performance of the Employment Agreement, defendant Altum failed and refused to comply with its obligations to pay compensation to plaintiff as set forth therein.

100. Such compensation includes the short fall on the stock and option distributions she had received based upon the inflated $1.20 pricing, the stock and option distributions owing for the first two quarters of 2020, and a $400,000 severance payment.

101.  Altum's refusal to pay the compensation due was in material breach of the Employment Agreement.

102.  By reason of the foregoing, plaintiff is entitled to compensatory damages in an amount to be determined at trial believe to be in excess of $2 million.

## FIFTH CLAIM—BREACH OF CONTRACT—ALTUM

103.  Plaintiff incorporates the foregoing allegations by reference herein.

104.  The Settlement Agreement was a binding contract supported by valuable consideration.

105. Plaintiff fully and faithfully performed her obligations under the Settlement Agreement.

106. Notwithstanding plaintiff's performance of the Settlement Agreement, defendant Altum failed and refused to comply with its obligations to make payments to plaintiff in any respect following its execution.  Only after this action was filed was a partial $45,000 payment made in an effort to forestall this litigation.

107.  Altum's refusal to pay the compensation due was in material breach of the Settlement Agreement.

108.   By reason of Altum's material breach of the Settlement Agreement, Ms. Miller-Rich is entitled at her election to rescission and to seek recovery of the amounts due and owing under her Consulting and Employment Agreements.

109. Alternatively, she may seek recover of the amounts due under the Settlement Agreement.

110. By reason of the foregoing, plaintiff is entitled to compensatory damages in an amount to be determined at trial believe to be in excess of $2 million.

WHEREFORE, plaintiff demands judgment against defendants, jointly and severally, awarding:

(1) compensatory damages in an amount to be determined at trial believed to be in excess of $2,00,000.00;

(2) punitive damages in any amount to be determined at trial believed to be in excess of $10,000,000.00;

(3) rescission of the Settlement Agreement or, in the alternative, compensatory damages in an amount to be determined at trial believed to be in excess of $2,00,000.00;

(4) costs and disbursements;

(5) attorney's fees;

(6) pre-judgment interest; and

(7) such other and further relief as is just and proper.

Dated: New York, New York
January 18, 2023

McCARNEY LAW P.C.

By _____
James G. McCarney
29 Broadway, 27th Floor
New York, New York 10006
(212) 797-1338
jmccarney@mccarneylaw.com

*Attorneys for Plaintiff*